In the Matter of the Estate of HENRY WANDER, Deceased.

Surrogate's Court, Kings County, October 15, 1931.

*Kramer & Binder*, for the executors.

*William Murray*, special guardian.

WINGATE, S. The fiduciaries of this estate seek judicial approval of a plan to dispose of the business of the deceased at a time prior to that directed by the will and to make such sale to one of their number. The questions submitted for decision are, therefore, *first*, whether they have power to dispose of property which the testator has expressly directed them to hold, and *second*, if this be determined in the affirmative, whether the sale here proposed is lawful and proper?

The testator died on March 27, 1930. His will was probated in this court on the twenty-second of the following May. Except for two legacies which lapsed, due to the fact that their beneficiaries predeceased the testator, the entire estate was erected into a trust for his widow and three infant children. All benefits in the will for the widow were conditioned on her failure to remarry, and terminated upon her taking such step.

For approximately fifteen years prior to his decease the testator had been engaged in the business of retail furrier in Brooklyn. His will directed his trustees to incorporate this business, to hold the stock in the trust, and to continue the business, as incorporated, under the management of his wife so long as she should remain unmarried and physically capable. Upon the termination of either of these conditions, its disposal, in the discretion of the trustees, was directed. The trustees have complied with these directions for incorporation and continuance of the business.

As a strict legal matter there can be no question of the power of the estate fiduciaries to dispose of the stock representing the incorporated business, prior to the time provided in the will for that purpose. This question was fully covered in the opinion in *Matter of Pulitzer* (139 Misc. 575) (see particularly pages 579 to 582), and any attempt to elaborate upon the learned and lucid exposition of Surrogate FOLEY therein would be a labor of supererogation. It follows, therefore, that the fiduciaries of this estate have full power and authority to sell this asset, if they deem such course advisable for the best interest of the *cestuis que trustent*.

Approaching now the question of the advisability of such action on their part, and particularly of the propriety of the proposed sale to the widow, it is a fundamental policy of this court, as noted in its opinions in *Matter of Ebbets* (139 Misc. 250, 252) and *Matter of Weissman* (140 id. 360, 363), that it will not undertake to advise

testamentary fiduciaries upon purely business questions. It is substantially impossible for the estate fiduciaries, by mere written words or even by testimony adduced upon a hearing, to put the court into possession of all of the facts pertinent to such a business decision. Even were this possible, the court must of necessity remain ignorant of those more or less intangible facts and conditions ascertainable only from personal association with the subject-matter and persons involved, which inevitably play so large a part in reaching any business decision.

The sound basis of this eminently salutary rule is aptly illustrated by the facts of the case at bar as determinable from the documents on file in this court. Were the facts disclosed by the documents on file the only basis for decision as to the advisability of the contemplated action, the court would, as a matter of business judgment, find some difficulty in concluding that the projected action was wise.

As determined in the transfer tax proceeding herein, the business of the decedent at the time of his death, on the appraisal submitted by the fiduciaries themselves, had a net worth of $41,478.36. This was made up of cash, $2,080.33; accounts receivable, $1,170; inventory, $37,500; machinery and fixtures, $10,000, subject to liabilities of $9,271.97. Pursuant to the terms of the will, the business was incorporated with these assets as capital and it inferentially appears that the widow has at all times continued to manage it in the building formerly owned by the decedent and which is now the property of the estate. As rental for the use of the premises the incorporated business has paid at the annual rate of $3,900, which sum, it is alleged, was arrived at by computing the annual carrying charges and operating expenses of the real estate and deducting therefrom the rental paid by other tenants.

During the years prior to his death, from January 1, 1925, until March 27, 1930, the testator made an apparent profit from the business varying from slightly over $5,000 to $8,500. It is contended by the petitioners that these figures are incorrect, owing to the fact that no rental was charged by the testator against the business, but even making allowance for this, it is apparent that the average annual profit of the business, when conducted by the testator, exceeded $2,500.

The petitioners further allege that in the nine months subsequent to the testator's death during which the business was conducted by the widow, the net value of the capital assets of the business declined from the transfer tax figure of slightly less than $41,500 to $34,233.43, showing a net loss for the period of $7,244.93. The court, however, notes from the report of the special guardian that a reappraisal

was had of certain of the assets, particularly the machinery and fixtures, and that this reappraisal fixed their value at $7,739 less than the value given them for transfer tax purposes. It is not at all clear whether or not the alleged nine months' loss was not due wholly to this reappraisal.

The petitioners represent that the estate has been compelled to borrow $14,372.39 from the widow for payment of debts, which figure is given in the proposed contract at $1,000 more. Why any such sum should have been necessary for this purpose is not made to appear. The total debts, funeral and administration expenses, plus commissions listed in the transfer tax proceedings, aggregated only $6,263.57.

The proposal for sale to the widow-executrix contemplates her cancellation of this loan and the payment by her of the sum of $3,500 in cash. This represents a total payment by her for the business of $17,872.39, which is apparently $16,361.05 less than the indicated value of the assets of the business on January 1, 1931. Perhaps such sale is for the advantage of the estate, but the facts stated certainly do not clearly demonstrate this to be the fact.

As a part of the arrangement with the widow, it is proposed to lease her the real property in which the business is conducted and which is substantially the only other asset of the estate, on a five-year lease at an annual rental of $4,800 for the first three years and $6,000 for the remaining two. This real property was appraised in the transfer tax proceeding at $72,500. It is said to be assessed at $69,000. It is subject to a first mortgage of $45,000, and, therefore, on the assessed value, shows an equity of $24,000. The proposed rental payment for the first three years, taken in conjunction with the previous statement regarding carrying costs, shows a net profit to the estate of $900 a year, which is three and three-quarters per cent on the investment. Is it wise for the trustees to tie up this property for such a period on an apparently unsecured lease which nets such a small return?

The foregoing are a few of the questions which it is the duty of the fiduciaries to determine, the sole criterion for their decision being the advantage of the estate. In reaching a conclusion as to whether any particular proposal for sale should be accepted, it is obviously essential that the trustees satisfy themselves that a better price or better terms are not obtainable elsewhere. Perhaps investigations in this direction have been made, but there is nothing shown on this subject in the moving papers herein. Respecting the concrete proposal herein submitted the trustees should not be influenced affirmatively or adversely by the fact that the proposed

purchaser is a co-fiduciary, their only burden in this regard being one of extra care, investigation and satisfaction that the price and terms proposed by her are at least as favorable as those which could be obtained from an independent third party.

The foregoing observations have been made not by way of approval or disapproval of the particular project proposed by the fiduciaries, but merely for the purpose of emphasizing the futility of any attempt by the court to exercise the proper functions of the fiduciaries.

On the one hand, the trustees, consisting of one of the best-known financial institutions in the world, and an individual, no doubt selected by testator in consequence of his known probity and sound business judgment, strongly advocate this sale. In addition, the special guardian appointed to protect the interests of the infants, who is an experienced member of the bar, of unquestionable standing, supports their judgment after a meticuously careful and exhaustive examination of the pertinent circumstances.

On the other hand, in the opinion of the court, the pertinent facts relating to the matter, as disclosed by the records, do not establish the advisability of the action so clearly as to make the court view the transaction in the same enthusiastic light as do the fiduciaries and the representative of the infants.

This failure of complete agreement may well be due to the fact that the fiduciaries and guardian are in a better position to judge of the matter than is the court. In any event, it is their duty to make the decision.

By way of summary, therefore, it may be said that the petitioners herein have a perfect right, and indeed a duty to sell this asset of the estate if they deem its further retention prejudicial to the best interests of the beneficiaries. If this decision be in the affirmative, it is their duty to sell for a fair price and on the best terms obtainable.

Proceed accordingly.